OPINION
This court's earlier opinions rendered in Woods v. Ohio Dept. of Rehab. Corr. (1999), 132 Ohio App.3d 780 (hereinafter "Woods I"), and Woods v. Ohio Dept. of Rehab. Corr. (Jan. 30, 2001), Franklin App. No. 00AP-252, unreported (hereinafter "Woods II"), provide an extensive review of the pertinent facts. In March 1994, plaintiff, Nute Woods, an inmate at the Madison Correctional Institution ("MCI"), worked on an asbestos abatement crew. On March 22, 1994, plaintiff and several other inmates were being transported from MCI in a van owned by defendant, Ohio Department of Rehabilitation and Correction, to a job site at the London Correctional Institution ("LCI"), less than two miles from MCI. Because the van had limited seating capacity, most of the inmates, including plaintiff, had to ride in the van's cargo section. Plaintiff sat on a fourteen-inch high plastic milk crate, which had been turned upside down. As there were no grab bars or braces to hold onto, plaintiff had to brace himself with his feet.
Enroute from MCI to LCI, the van made a turn. The milk crate on which plaintiff was sitting tipped over, causing plaintiff to fall to the floor of the van. Plaintiff's left knee struck a metal bracket that was welded to and sticking up from the van floor. X-rays taken shortly after the accident revealed no evidence of fracture, dislocation, or significant skeletal joint abnormalities; however, plaintiff suffered a contusion to his knee that required subsequent medical care.
On January 6, 1997, plaintiff filed a complaint in the Ohio Court of Claims against defendant, alleging that defendant was negligent in transporting him to the LCI job site. The issues of liability and damages were bifurcated, and on December 4, 1997, a trial was held on the issue of liability. In a decision rendered on May 27, 1998, the trial court found that defendant was not negligent. On appeal, this court reversed the trial court's decision and remanded the case for further proceedings with regard to issues of proximate cause, comparative negligence, and damages. Woods I.
On remand, the trial court determined that plaintiff was twenty percent responsible for his injuries and assessed plaintiff's damages at $10,000 (minus twenty percent) for pain and suffering measured from the date of injury through the end of 1994. The court further found that plaintiff suffered no injury beyond the end of 1994 and was therefore not entitled to recover further damages. On appeal, this court upheld the $10,000 award for damages sustained from the date of injury through the end of 1994, but reversed the determination that plaintiff had suffered no injury beyond the end of 1994. Specifically, this court concluded that "the record supports the finding that [plaintiff] continued to receive treatment for his knee injury well beyond 1994." Accordingly, this court remanded the matter to the trial court "to find, on the record previously made, the monetary value of injuries to [plaintiff] after 1994 and to add the amount so found (minus twenty percent), to $8,000, which shall then be entered as the final judgment of the trial court." Woods II.
In a decision and entry issued on May 23, 2001, the trial court determined the monetary value of plaintiff's injuries after 1994 to be $2,000 (minus twenty percent). Plaintiff filed a timely appeal from the trial court's judgment, and advances a single assignment of error, as follows:
 The Trial Court committed error in holding that Plaintiff was only entitled to $2,000 for his damages beyond 1994.
By his assignment of error, plaintiff challenges the trial court's determination that he is entitled to only $2,000 in damages for the period beyond 1994 as being against the manifest weight of the evidence. Specifically, plaintiff contends that the $2,000 damage assessment is "so grossly inadequate that it shocks the conscience and is an abuse of discretion." (Plaintiff-appellant's brief at 6.) Plaintiff argues that a more appropriate award would be $30,000 ($10,000 for each of years 1995, 1996 and 1997) and requests that this court reverse the trial court's judgment and enter such an award. In contrast, defendant contends that the testimony of both plaintiff's medical expert and defendant's medical expert supports the trial court's award.
Plaintiff's expert, Dr. Edwin H. Season, an orthopedic surgeon, testified by deposition on September 8, 1999, that he had reviewed the history and treatment of plaintiff's knee injury. To that end, Dr. Season noted that x-rays taken of plaintiff's left knee on March 28, 1994 revealed no evidence of fracture, dislocation or skeletal joint abnormality, but did show "moderate soft tissue reaction." (Season Depo. at 9.) He further noted that x-rays taken on May 12, 1994, were negative for fractures, but that an arthrogram performed on May 16, 1994, revealed a "moderate subluxation of the tibia with respect to the femur and the lateral projection." (Season Depo. at 9.)
Dr. Season further noted that on May 26, 1994, and again on July 14, 1994, plaintiff was diagnosed as having patellofemoral syndrome[1] and was prescribed anti-inflammatory medication and a knee support. On February 9, 1995, plaintiff was diagnosed as having a chronic left knee sprain and physical therapy was ordered. On March 24, 1995, plaintiff was prescribed a cane to aid in walking. On February 3, 1997, he was prescribed a brace to provide stability to the knee. In sum, the treatment notes reviewed by Dr. Season revealed that from the time of plaintiff's injury in March 1994 through the end of 1997, plaintiff received treatment for his knee injury via a combination of anti-inflammatory medications, pain medications, and stability and walking aids such as a cane and/or knee brace.
Dr. Season further testified that he examined plaintiff on July 12, 1996, at which time plaintiff complained of chronic knee pain, including stiffness and instability and stated that he was taking nine to twelve Tylenol per day for pain. According to Dr. Season, plaintiff ambulated with a left antalgic gait (limp) and needed a cane to assist with walking. Upon examination of plaintiff's knee, Dr. Season diagnosed plaintiff with a chronic left knee sprain/strain and patella chondromalacia.[2] Dr. Season recommended restrictions upon plaintiff's standing and walking. He further recommended an exercise program for treatment and the use of mild pain medication.
Dr. Season again examined plaintiff on August 27, 1999. Dr. Season noted that plaintiff continued to complain of pain and instability at the left knee and wore a knee sleeve for support. Plaintiff continued to take medication for pain relief and walked with a cane for support. Dr. Season again diagnosed plaintiff with chronic knee sprain/strain and patella chondromalasia and recommended continued restrictions upon plaintiff's standing and walking. He further recommended restrictions on lifting and limited his work activities to "light work." (Season Depo. at 14.)
At the conclusion of his direct testimony, Dr. Season opined, to a reasonable degree of medical certainty, that plaintiff's symptoms would continue into the future. Dr. Season based his opinion upon a review of plaintiff's treatment history, the physical examinations conducted in July 1996 and August 1999, and plaintiff's continuing complaints of knee pain and instability.
On cross-examination, Dr. Season acknowledged a lack of significant objective findings to support plaintiff's ongoing subjective complaints. Specifically, Dr. Season stated that plaintiff's x-rays and arthrogram failed to reveal any significant objective evidence to support plaintiff's subjective complaints. In addition, Dr. Season testified that his two examinations of plaintiff's knee revealed no ligament damage, no fluid in the knee joint, no swelling, no grinding/grating/clicking upon movement of the knee, and a normal range of motion. On re-direct, Dr. Season testified that the lack of the above-noted objective findings was not fatal to his diagnosis of chronic patella chondromalacia.
Defendant's expert, Dr. Walter H. Hauser, an orthopedic surgeon, testified by deposition on September 28, 1999 that he reviewed medical records relating to plaintiff's injury, including the x-rays and arthrogram. In addition, Dr. Hauser performed a physical examination of plaintiff on July 20, 1999, during which plaintiff provided an overview of his injury and course of treatment. According to Dr. Hauser, plaintiff complained of a "burning sensation" in the outer portion of the knee and an instability of the knee whenever he walked a great distance. Dr. Hauser noted that plaintiff did not appear to be experiencing any acute distress or discomfort at the time of the examination.
Dr. Hauser further noted that upon physical examination of the knee, he found no increased fluid or inflammation around the joint, no thickening of the joint lining, no tenderness in the area around the knee, no swelling, no tearing or instability of the ligaments and a normal range of motion. In addition, x-rays taken as part of the examination revealed no abnormalities. Based upon the physical examination and discussion with plaintiff, Dr. Hauser concluded that there were no objective findings or subjective complaints of note. Dr. Hauser opined that on March 21, 1994, plaintiff simply suffered a contusion to his left knee accompanied by swelling and fluid retention; that the fluid had been reabsorbed into the body; and that plaintiff "should long since have recovered." (Hauser Depo. at 15.) Dr. Hauser found nothing to indicate that plaintiff would need future medical treatment for his knee. Dr. Hauser's testimonial opinion was corroborated by a written report prepared on the day of the physical examination, wherein Dr. Hauser stated that he "[found] no evidence of any permanent, residual, impairment or disability." (Depo. Exhibit 2, at 2.)
Further, Dr. Hauser testified that he could not understand why plaintiff was still subject to a job restriction in January 1995 or why he was dispensed a cane in March 1995 and a knee brace in February 1997. Indeed, Dr. Hauser noted that the MCI medical records imposing the job restriction and ordering use of ambulatory aids contained no objective physical findings to justify such measures. Dr. Hauser admitted, however, that plaintiff's subjective complaints of knee pain and/or instability could have been the impetus for such measures.
As noted previously, plaintiff asserts that the trial court's judgment awarding him only $2,000 in damages beyond 1994 is against the manifest weight of the evidence. Our standard of review on a manifest weight challenge is well-known. An appellate court may not reverse a trial court's judgment as being against the manifest weight of the evidence if the judgment is "supported by some competent, credible evidence going to all the essential elements of the case." C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. Great deference is afforded to the findings of the trial court, which has had the opportunity to view the witnesses in person and to observe their demeanor, gestures and voice inflections. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
Initially, we note that we agree with plaintiff's contention that defendant's reliance upon the testimony of Dr. Hauser as evidence to support the $2,000 judgment is misplaced. Dr. Hauser opined that any injury suffered by plaintiff healed by the end of 1994, an opinion this court rejected in Woods II.
We disagree, however, with plaintiff's contention that Dr. Season's testimony establishes that the $2,000 award is so inadequate as to require reversal. Although Dr. Season testified that plaintiff received treatment for his knee injury through the end of 1997 and opined that plaintiff's symptoms would continue into the future, he acknowledged that no objective findings supported plaintiff's ongoing subjective complaints. Further, Dr. Season's testimony regarding plaintiff's ongoing subjective complaints does not establish that plaintiff's injury caused him pain and suffering of the same level and/or intensity in 1995, 1996 and 1997, as that suffered by him in 1994. As distinguished from Farley v. Ohio Dept. of Rehab. Corr. (1998), 128 Ohio App.3d 137, plaintiff provided no evidence, via the testimony of Dr. Season or otherwise, substantiating his claim for $10,000 in damages for each of the years 1995, 1996 and 1997. As noted by this court in Woods II: "[I]t is within the discretion of the fact finder to determine the amount of an award, which is not grossly disproportionate to the injuries and elements of damages proved. Such award will be reversed on appeal only where the fact finder abused its discretion." In the instant case, the trial court, in its discretion, determined the monetary value of plaintiff's residual injuries after 1994 to be $2,000. On the record before us, we cannot find that such award is grossly disproportionate to the injuries and damages proved. Accordingly, plaintiff's assignment of error is not well-taken.
For the foregoing reasons, we overrule plaintiff's assignment of error and affirm the judgment of the Court of Claims of Ohio with the following recalculation. Reducing the monetary value of plaintiff's injuries after 1994 ($2,000) by twenty percent to account for plaintiff's own negligence results in additional damages of $1,600, not $1,800 as stated in the trial court's judgment entry. Judgment for plaintiff should therefore be rendered in the amount of $9,625, which includes the $25 filing fee paid by plaintiff.
Judgment affirmed with instructions.
TYACK, P.J., and BRYANT, J., concur.
[1] Dr. Season described "patellofemoral syndrome" as pain originating at the kneecap caused by an inflammation of the joint surface due to the kneecap being too mobile. (Season Depo. at 11.)
[2] Dr. Season described "patella chondromalacia" as a problem involving the muscles and ligaments surrounding the kneecap. (Season Depo. at 14.)